JANETTE M. TOWER, RESPONDENT, v. THE CITY OF ST. LOUIS, A MUNICIPAL CORPORATION, CHARLES W. BOWEN AND ELIZABETH BOWEN, DEFENDANTS, CHARLES W. BOWEN AND ELIZABETH BOWEN, APPELLANTS.—148 S. W. (2d) 100.

St. Louis Court of Appeals. Opinion filed March 4, 1941.

*Hay & Flanagan* and *Louis L. Hicks* for respondent.

*Leahy, Walther & Hecker* and *Wm. O'Herin* for appellants.

McCULLEN, J.—This suit was brought by respondent, as plaintiff, against The City of St. Louis and Charles W. Bowen and Elizabeth Bowen, as defendants, to recover damages for personal injuries resulting from slipping on ice in the street at the intersection of Clayton and Central Avenues in the City of St. Louis. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff in the sum of $500 and against all defendants. Charles and Elizabeth Bowen alone have appealed.

Plaintiff's amended petition, upon which the case was tried, alleged that defendants Bowen owned property at 6749 Clayton Avenue in the City of St. Louis, and were supplied with water by defendant The City of St. Louis, and owned and were maintaining and in control of a service pipe through which water ran from the main of defendant The City of St. Louis under the pavement of Clayton Avenue to the water pipes in said property of defendants Bowen; that, on December 10, 1936, and for a long time prior thereto, there was a leak in said service pipe from which water flowed and came up through the paving on Clayton Avenue at a point in front of said property; that, on December 10, 1936, while plaintiff was walking on Clayton Avenue in front of said property, she was caused to slip and fall on ice which had formed from said water and thereby sustained serious and permanent injuries.

The negligence alleged against defendant The City of St. Louis was (1) that it failed to exercise ordinary care to keep and maintain

said street in a reasonably safe condition for ordinary travel by pedestrians in that on the date aforesaid, and for a long time prior thereto, it negligently suffered and permitted water to come up through the paving on Clayton Avenue at the point aforesaid when it knew, or by the exercise of ordinary care would have known, of said condition, in time thereafter to have prevented the same; (2) that said defendant on the date aforesaid, and for a long time prior thereto, negligently permitted said street to be and remain covered with ice formed by the water which came up through the paving when it knew, or by the exercise of ordinary care would have known, of the presence of said ice on the street, in time thereafter by the exercise of ordinary care to have removed same.

The negligence alleged against defendants Bowen in plaintiff's amended petition was (1) that said defendants negligently suffered and permitted said service pipe to leak, and water therefrom to come up through the pavement of the street when defendants knew, or by the exercise of ordinary care would have known, that said pipe leaked and that water therefrom coming up through the pavement would be apt to freeze and make said street slippery and dangerous for pedestrians, in time thereafter by the exercise of ordinary care on the part of said defendants to have repaired said leak; (2) that said defendants negligently failed to inspect said service pipe when, by the exercise of ordinary care in so doing, defendants would have discovered the leak in said pipe in time, thereafter by the exercise of ordinary care, to have repaired the same; (3) that said defendants negligently failed to repair the leak in said service pipe when they knew, or by the exercise of ordinary care would have known, that it leaked, in time thereafter by the exercise of ordinary care to have repaired said leak; (4) that said defendants negligently failed to remove the ice formed from the water which leaked from said service pipe when, by the exercise of ordinary care, they could have done so prior to plaintiff's falling thereon.

All defendants answered with general denials coupled with pleas of contributory negligence on the part of plaintiff in that, in crossing the street, plaintiff failed to look where she was walking; that, by the exercise of ordinary care, plaintiff could and would have discovered and avoided said icy street and would have avoided the injuries alleged, but negligently and carelessly failed to do so.

No point is made in this appeal with respect to the nature or extent of plaintiff's injuries, hence it will not be necessary to refer to that subject.

The defendants Bowen contend that the trial court erred in refusing to give and read to the jury the instruction in the nature of a demurrer to the evidence requested by them at the close of all the evidence.

Clayton Avenue is a street running east and west in the City of St. Louis; Central Avenue runs north and south and intersects Clayton Avenue at an angle. It was admitted that the defendants Bowen owned and lived in the house numbered 6749 Clayton Avenue, at the northeast corner of the intersection of the two streets named. The evidence showed that a twelve-inch water main ran east and west in the center of Clayton Avenue about four feet below the surface. Connected with the twelve-inch main in front of the Bowen property was a lead service pipe through which water was conveyed into the Bowen house. The lead service pipe was connected into the twelve-inch main at a shut-off valve attached to the main. It appears that in July, 1935, the City of St. Louis laid a new sixty-inch steel water main just south of the center line of Clayton Avenue; that said new water main entered Clayton Avenue at Skinker Boulevard and ran east, under Clayton Avenue, to the intersection of Clayton and Central Avenues where it turned to the south; that excavating was done at the intersection by the City of St. Louis at that time in digging the trench for the new main as well as other work in the street in connection therewith.

Defendants' Exhibit No. 1, a photograph of the intersection, which was introduced in evidence, shows that Clayton Avenue, which was paved with asphalt, contained a great many cracks in the surface of the street. It appears without dispute that the weather had turned colder on December 10, 1936, and the water, which came up through cracks in the pavement of the street, froze and formed ice on the street.

Plaintiff lived on the north side of Clayton Avenue in the block immediately east of Central Avenue. About 3:30 P. M. on December 10, 1936, on a visit to a nearby store, she walked on the north side of Clayton Avenue to the corner of Central Avenue and crossed on the east side of Central Avenue to the south side of Clayton. She noticed the ice on the street and walked over it. Returning from the store, she crossed Central Avenue to the east side thereof and then started to cross to the north side of Clayton Avenue when she slipped on the ice and fell. Shortly thereafter she was taken to her home and later in the afternoon a police officer of the City of St. Louis interviewed her.

In the early afternoon of the next day, December 11, 1936, John Nockenhorst, an inspector of the Water Department of the City of St. Louis, received an emergency call from the Police Department, notifying him there was a leak in the street at the intersection mentioned. Mr. Nockenhorst testified that, after receiving the notice, he immediately went out to the intersection and saw the street full of water; that "we sounded the service at 6749. By sounding the service I mean we had a shut-off key and we put that on the T-head at the stop box and put a telephone receiver on it to sound the service. The stop box is located between the curb and the sidewalk. . . . We

have an aquaphone to make that test. You put it up to your ear like a telephone and hook it on the shut-off key. If there is a leak in the private pipe it will give you a whistling noise. . . . This test that I made was on a water pipe leading into the home of Mr. and Mrs. Bowen at 6749 Clayton Avenue." The witness further testified that he served a notice on defendant Mrs. Bowen to have the leak repaired in twenty-four hours or the water would be shut off. On cross-examination, the witness testified: "When we have a leak like that in the street coming up through a crack in the pavement, the only way that you can find where it is coming from is by this scientific test that I made."

Alden C. Williams testified on behalf of plaintiff that he was an instrument man with the Water Department of the City of St. Louis; that he was sent out to the vicinity of the Bowen property on December 14, 1936, to make an inspection of the water pipes there "after the plumber had the hole excavated;" that when he made the inspection, the water had been shut off at the corporation cock by the plumber; that "that is where they shut off the main line and about six inches from this connection of the lead pipe I saw about four or five notches on the pipe and you could see the water bubble up a little bit; . . . these notches were just sort of like cuts in the pipe that could have been made by a shovel or a pick; I couldn't tell whether they were fresh cuts because I didn't get down in the hole . . ." The witness stated that the "nicks" which he saw were not in the pipe main; that the leak was out in the street in Clayton Avenue right off the twelve-inch main, and that the pipe led into the home of defendants Bowen; that there was no way to tell where the leaking water came from "unless you conducted some tests to determine that."

John J. Lesyna, a licensed plumber in the City of St. Louis, testified that he was employed by defendants Bowen to do work on water pipes in the street on Clayton Avenue in front of their home; that the pipe he worked on "is a private pipe running from the city property into Mr. Bowen's property. When we dug up the street we located this leak. It was in the service pipe. This service pipe was a five-eighths of an inch lead pipe and was connected to the city main. Between the city main and the private pipe there is a corporation for the city customers, which is sort of a shut-off valve. . . . The lead pipe leads from the corporation into the property. I found that this pipe had leaks in it. We found one hole and repaired it, turned the water on, and then another one developed, so we repaired that one. These holes leaked water when we first opened up the ground. This pipe was about three and a half feet below the surface of the street. Mr. Bowen called me to do that work and he paid my bill."

On cross-examination, the witness described how the City of St. Louis had laid a sixty-inch steel water main in Clayton Avenue during the summer of 1935; that the excavation therefor was made almost in the center of the street. He described the positions of what he called the "big main," referring to the sixty-inch main, and a "small" main, testifying that the sixty-inch main went down Clayton Avenue and turned south on Central; that the excavation which he made to repair the service pipe at the request of defendants Bowen, after plaintiff sustained her injury, was a little to the northeast of where the big main turned and went south on Central, "I would judge about five or six feet from there. . . . This place that I found leaking was about two feet away from the corporation cock. I think there were about four or five marks on that pipe. They looked to me like shovel marks." The witness further testified that "there wasn't any way you could tell there was a leak in that pipe until it was tested; not until the water was on."

Defendant Charles W. Bowen, testifying as a witness, was shown defendants' Exhibit No. 1, the photograph heretofore mentioned, and pointed out thereon where Lesyna, the plumber employed by him, had dug down in the street to repair the leaks. The witness stated: "I did not know there was a leak about where this service pipe was located there at the twelve-inch main before John Lesyna dug down in the street. I had no way of knowing. I received a notification from the City about this leak. It was a short notice I know. It said to have this leak repaired immediately or the water would be shut off. . . . I received that notice on the 11th of December, 1936. I never received any notice about any leaking pipe out there prior to the time that Mrs. Tower fell. I immediately gave the notice to John Lesyna and he went to work to repair that leak as soon as possible. . . . I saw nicks on that pipe and it was through one of these nicks that the leak was coming." The witness further testified: "I would say that water had been leaking at that spot I have indicated in front of my home for ten days or two weeks before December 10, 1936. . . . Clayton and Central Avenues are both asphalt streets and there are numerous small cracks in it near the center of the street. The water was coming up through one of the small cracks and flowing to the north curb of Clayton Avenue and then flowing east along the curb." The witness further testified: "At the time this froze up on the north side there was ice all the way down a distance of one hundred or one hundred and fifty feet from the intersection of that street from the center of Clayton Avenue."

The attention of the witness was directed by his counsel to his testimony on direct examination wherein he used the words "my service pipe," and he was asked what he meant by the use of those words. He answered: "Well, I didn't mean my service pipe; I meant the pipe that runs from the main to my house."

George Herbert, a clerk in the plumbing department of the City of St. Louis, called as a witness, produced a record of the City showing that a permit was taken out by John Lesyna, a plumber, on December 14, 1936, and that the repair of the service pipe was made on that date. The witness testified that he had made a search of the records and they showed that was the only time any repairs were made on the service pipe in question.

There was other evidence, but in the view we take of the case it is not necessary to set it forth.

We are of the opinion that the evidence in this record, which we have set forth at considerable length, leads inescapably to the conclusion that the court should have sustained the instruction in the nature of a demurrer to the evidence requested by the defendants Bowen at the close of all the evidence.

It is clear that there was no evidence whatsoever to give rise to a duty upon the part of defendants Bowen to keep or maintain the street in front of their home in a safe condition. That duty rested upon defendant The City of St. Louis. The general rule applicable to the situation shown in the evidence in this case is stated in 25 Am. Jur., Highways, section 364, p. 657, as follows:

"In accordance with general principles previously discussed, where the owner or occupant of land abutting on a highway is under no legal duty with respect to the maintenance or repair of the way, he is not liable for injuries sustained by travelers thereon as the result of conditions which he has not been instrumental in creating or maintaining."

There is no evidence in this case to show that the defendants Bowen installed the service pipe from which the water leaked, or that they did anything to it before plaintiff fell; nor is there any evidence to show that they knew that it was the service pipe leading into their home that was leaking. It is clear that they could not have had such knowledge because the leaking pipe was about four feet below the surface of the street. Even if said defendants had desired to ascertain the cause of the leak and the exact spot where it was located in the street below the surface, before plaintiff was injured, they could not have done so without making the kind of test with instruments that was made by the inspector for defendant The City of St. Louis. No citizen or mere property owner could reasonably be expected to be equipped to make such a test. Such an inspection would have meant the exercise, not of ordinary care, but of extreme and extraordinary care on the part of the defendants Bowen. The law does not place any duty upon an owner of property abutting on a public street to exercise any such high and unusual degree of care to avoid injury to a person on such street. Furthermore, said defendants could not have had the public street dug up or interfere with it in any manner without a permit from the City of St. Louis.

[Sheridan v. City of St. Joseph, 232 Mo. App. 615, 110 S. W. (2d) 371, 380.] The fact that, after being notified by the City of St. Louis of the leak in the service pipe, defendants Bowen, through a plumber, procured a permit and had an excavation made in the street and the service pipe repaired is not evidence of negligence on their part. Such evidence is far from sufficient to cast liability on said defendants for failure to have inspected and repaired the service pipe before they received such notice from the City of St. Louis. The fact that they were ordered by the City of St. Louis to repair the pipe, failing which the water would be shut off, and the further fact that they were required to apply to the city for a permit to dig a hole in the street to do such repair work, make it obvious that they had no control over the conditions which caused plaintiff's injuries any more than any other owner of property abutting on the street where the ice formed. The evidence herein not only fails to show that said defendants created the dangerous condition on the street, but, quite to the contrary, conclusively shows that the City of St. Louis had and exercised complete control over the street at all times, and under the law it was the city's duty to exercise ordinary care to maintain its street in a reasonably safe condition for the use of travelers thereon, as will be shown by the cases hereinafter referred to.

Counsel have cited no case in which the exact situation here shown was involved, and we have found none. However, a number of cases have been decided by the courts of this State in which the law relating to the duty of the owner of property abutting on a public sidewalk or public street has been applied under various states of fact and we think the doctrine applied in such cases is applicable to the case at bar.

Lucas v. St. Louis & Suburban Ry. Co., 174 Mo. 270, 73 S. W. 589, was a case in which an electric lighting company had placed a pole for its lights within a public street. Thereafter the street railway company placed a platform around the pole for the use of its passengers, but it was upon the public street. Afterwards the lighting company cut down the pole but left the stump thereof about a foot above the platform. Later the railway company replaced the wooden platform with a granitoid one, leaving the stump there. Plaintiff therein went upon the platform intending to become a passenger upon one of defendant's cars, and while she was signalling the car to stop her foot struck the stump and she fell from the platform upon the defendant's track and was injured. There was a judgment for plaintiff against the railway company but upon appeal the judgment was reversed outright. In that case the court said:

"But no citizen is under any personal, legal obligation to remove a nuisance from a public highway, notwithstanding he may know it is calculated to do injury to a traveler on the highway if it is allowed to remain there. To make any man liable for a tort he must have done

or omitted to do a duty imposed upon him by law. In the absence of such a duty there is no liability. The law imposes no duty upon the defendant to remove a nuisance in a public highway, which it did not put there.'' [Lucas v. St. Louis & Suburban Ry. Co., 174 Mo. 270, 277, 73 S. W. 589.]

In Norton v. The City of St. Louis, 97 Mo. 537, plaintiff brought suit against the City of St. Louis and a life insurance company to recover damages for injuries received from a fall on a sidewalk in front of a vacant lot owned by the insurance company. The negligence charged was that snow and ice had been permitted to accumulate and remain for a long time in slippery masses on the sidewalk in question, thereby rendering it unsafe and dangerous to passers thereon. An ordinance of the city required all persons to keep the paved sidewalk in front of their premises ''swept and clear of mud, dirt, and filth, and after any fall of snow to cause the same to be immediately removed from said sidewalk.'' The ordinance provided a penalty for failure to comply with its terms. The insurance company demurred to plaintiff's petition and its demurrer was sustained. Thereafter, the case was tried on the amended petition of plaintiff and the city's answer. There was a verdict and judgment for plaintiff against the city and the city appealed. In the Supreme Court the city argued that, under the provisions of its charter, it could not be held liable because the insurance company had not been held liable. The charter provision referred to provided that, whenever the city should be made liable to an action for damages by reason of the negligence of any person or corporation and such person or corporation should also be liable to an action on the same account by the party injured, the injured party, if he sued the city for damages, should also join such other person or corporation so liable, and that no judgment should be rendered against the city unless judgment was rendered against such other person or corporation so liable to be sued. Answering the city's contention, the court said:

''This contention cannot be maintained. The city is sought to be charged in this case because of its neglect to discharge a duty it *owed to the plaintiff as a traveler on one of its public streets over which it alone had exclusive power and control.* It is liable, if at all, because of its own negligence and not by reason of the negligence of any other person or corporation. *'It is the duty of defendant to keep its streets in a reasonably safe condition for persons traveling thereon.'* [Kiley v. City of Kansas, 87 Mo. 103.] *Nor can this duty be evaded, suspended or cast upon others by any act of its own.* [Russell v. Town of Columbia, 74 Mo. 480; Welsh v. City of St. Louis, 73 Mo. 71.]

''Conceding that the city has the power to cause obstructions upon the sidewalk to be removed at the expense of the owners of the ground fronting thereon, and that the ordinance requiring such owners, im-

mediately after any fall of snow, to cause the same to be removed from the sidewalk in front of their premises, is a legitimate mode of exercising that power, *yet, the city could not, by passing such an ordinance, relieve itself of its duty to the plaintiff and to the public traveling on its streets of keeping its sidewalk in a reasonably safe condition for travelers thereon, or transfer or impose that duty upon another.''* [Norton v. The City of St. Louis, 97 Mo. 537, 541, 542.] (Italics ours.)

In the later case of the City of St. Louis v. The Connecticut Mut. Life Ins. Co., said city sought to collect from the life insurance company, as owner of the abutting property, the sum of $1291.18, representing damages and costs adjudged against the city in the case of Norton v. The City of St. Louis, *supra,* for the injuries sustained by Mrs. Norton. A demurrer to the city's petition was sustained by the trial court and the city appealed to the Supreme Court. In its petition the city set forth its ordinance heretofore referred to, which required owners of property, after any fall of snow, to cause the same to be removed from the sidewalk fronting their property. The city's contention was that it had right to recover back from the insurance company the damages it was compelled to pay to Mrs. Norton. In the concluding part of its opinion in that case, the court said:

''The doctrine on this subject is tersely stated in 2 Shearman & Redfield on Negligence, section 343, as follows: '*An abutting owner, as such, owes no duty to maintain the street or sidewalk in front of his premises, and is not responsible for any defects therein which are not caused by his own wrongful act.* . . . The fact that he violates a city ordinance, which requires abutting owners to remove snow and ice from the sidewalk in front of their premises within a certain time after their accumulation, does not render him liable to one injured by falling upon such snow and ice, nor to the city which had suffered judgment for the same injury.' [Citing cases.]'' [The City of St. Louis v. Connecticut Mut. Life Ins. Co., 107 Mo. 92, 97, 98.] (Italics ours.)

The doctrine referred to in the last above-mentioned case with respect to the duty of the owner of property abutting on a public sidewalk or a public street has been adhered to and applied in cases too numerous to present here. A few such cases, showing the application of said doctrine under various situations, are: Reedy v. Brewing Assn. and City of St. Louis, 161 Mo. 523, 533, et seq., 61 S. W. 859; Russell v. Sincoe Realty Co., 293 Mo. 428, 240 S. W. 147; Callaway v. Newman Merc. Co., 321 Mo. 766, 12 S. W. (2d) 491; Schindler v. Standard Oil Co. of Ind., 207 Mo. App. 190, 232 S. W. 735; Sheridan v. City of St. Joseph, 232 Mo. App. 615, 629, 110 S. W. (2d) 371, 379.

There being no evidence to show any actionable negligence on the part of the defendants Bowen in the case at bar. It is our duty to

hold that the court erred in refusing to sustain their demurrer to the evidence. The judgment, as to said defendants Bowen, is accordingly reversed.

*Hughes, P. J.,* concurs. *Anderson, J.,* not sitting because not a member of the court when the cause was submitted.